UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MICHAEL GRESHAM,

                Plaintiff,                        Case No. 1:12-cv-276

v.                                        Honorable Paul L. Maloney

JOHN PRELESNIK et al.,

                Defendants.

_____/

## OPINION DENYING LEAVE
## TO PROCEED *IN FORMA PAUPERIS* - THREE STRIKES

Plaintiff Michael Gresham, a prisoner incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF), filed a complaint pursuant to 42 U.S.C. § 1983. Plaintiff seeks leave to proceed *in forma pauperis*. Because Plaintiff has filed at least three lawsuits that were dismissed as frivolous, malicious or for failure to state a claim, he is barred from proceeding *in forma pauperis* under 28 U.S.C. § 1915(g). The Court will order Plaintiff to pay the $350.00 civil action filing fee within twenty-eight (28) days of this opinion and accompanying order, and if Plaintiff fails to do so, the Court will order that his action be dismissed without prejudice. Even if the case is dismissed, Plaintiff will be responsible for payment of the $350.00 filing fee in accordance with *In re Alea*, 286 F.3d 378, 380-81 (6th Cir. 2002).

### Discussion

The Prison Litigation Reform Act (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which was enacted on April 26, 1996, amended the procedural rules governing a prisoner's request for the privilege of proceeding *in forma pauperis*. As the Sixth Circuit has stated, the PLRA

was "aimed at the skyrocketing numbers of claims filed by prisoners – many of which are meritless – and the corresponding burden those filings have placed on the federal courts." *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997). For that reason, Congress put into place economic incentives to prompt a prisoner to "stop and think" before filing a complaint. *Id.* For example, a prisoner is liable for the civil action filing fee, and if the prisoner qualifies to proceed *in forma pauperis*, the prisoner may pay the fee through partial payments as outlined in 28 U.S.C. § 1915(b). The constitutionality of the fee requirements of the PLRA has been upheld by the Sixth Circuit. *Id.* at 1288.

In addition, another provision reinforces the "stop and think" aspect of the PLRA by preventing a prisoner from proceeding *in forma pauperis* when the prisoner repeatedly files meritless lawsuits. Known as the "three-strikes" rule, the provision states:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under [the section governing proceedings *in forma pauperis*] if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The statutory restriction "[i]n no event," found in § 1915(g), is express and unequivocal. The statute does allow an exception for a prisoner who is "under imminent danger of serious physical injury." The Sixth Circuit has upheld the constitutionality of the "three-strikes" rule against arguments that it violates equal protection, the right of access to the courts, and due process, and that it constitutes a bill of attainder and is *ex post facto* legislation. *Wilson v. Yaklich*, 148 F.3d 596, 604-06 (6th Cir. 1998); *accord Pointer v. Wilkinson*, 502 F.3d 369, 377 (6th Cir. 2007) (citing

*Wilson*, 148 F.3d at 604-06); *Rodriguez v. Cook*, 169 F.3d 1176, 1178-82 (9th Cir. 1999); *Rivera v. Allin*, 144 F.3d 719, 723-26 (11th Cir. 1998); *Carson v. Johnson*, 112 F.3d 818, 821-22 (5th Cir. 1997).

Plaintiff has been an extremely active litigant in this Court, having filed more than thirty civil actions. The Court has dismissed numerous actions by Plaintiff for failure to state a claim. *See Gresham v. Caruso et al.*, No. 2:10-cv-196 (W.D. Mich. Oct. 27, 2011); *Gresham et al. v. Canlis et al.*, No. 2:11-cv-179 (W.D. Mich. July 29, 2011); *Gresham v. Wolak et al.*, No. 2:10-cv-239 (W.D. Mich. July 25, 2011); *Gresham v. Caruso et al.*, No. 2:10-cv-195 (W.D. Mich. Apr. 11, 2011); *Gresham v. Paine et al.*, No. 1:10-cv-1146 (W.D. Mich. Mar. 8, 2011); *Gresham v. Caruso et al.*, No. 1:10-cv-1038 (W.D. Mich. Jan. 26, 2011); *Gresham v. Verville et al.*, No. 2:10-cv-198 (W.D. Mich. Jan. 19, 2011); *Gresham v. Mich. Dep't of Corr. et al.*, No. 2:07-cv-241 (W.D. Mich. June 9, 2008). In addition, the Court has denied Plaintiff leave to proceed *in forma pauperis* on numerous occasions because he has three strikes. *See Gresham v. Mutschler et al.*, No. 2:12-cv-9 (W.D. Mich. Feb. 12, 2012); *Gresham v. Violetta et al.*, No. 2:12-cv-24 (W.D. Mich. Feb. 6, 2012); *Gresham v. Dahl et al.*, No. 2:12-cv-21 (W.D. Mich. Feb. 6, 2012); *Gresham v. Napel et al.*, No. 2:11-cv-520 (W.D. Mich. Feb. 6, 2012); *Gresham v. Snyder et al.*, No. 2:12-cv-5 (W.D. Mich. Jan. 27, 2012); *Gresham v. LaChance et al.*, No. 2:11-cv-231 (W.D. Mich. June 24, 2011); *Gresham et al. v. Canlis et al.*, No. 2:11-cv-179 (W.D. Mich. June 9, 2011); *Dennis et al. v. Canlis et al.*, No. 2:11-cv-186 (W.D. Mich. June 6, 2011).

This case is one of twelve filed by Plaintiff since January 2012 in which he seeks to invoke the statutory exception for a prisoner who is under imminent danger of serious physical injury. *See* 28 U.S.C. § 1915(g).

- 3 -

While the Sixth Circuit has not defined the term "imminent danger" for purposes of this section, other Circuits have held that to meet the requirement, the threat or prison condition "must be real and proximate" and the danger of serious physical injury must exist at the time the complaint is filed. *See, e.g., Ciarpaglini v. Saini*, 352 F.3d 328, 330 (7th Cir. 2003); *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 313 (3d Cir. 2001) (en banc). Thus a prisoner's assertion that he or she faced danger in the past is insufficient to invoke the exception. *Id.* Other Circuits also have held that district courts may deny a prisoner leave to proceed pursuant to § 1915(g) when the prisoner's claims of imminent danger are "conclusory or ridiculous," *Ciarpaglini*, 352 F.3d at 331, or are "'clearly baseless' (i.e. are fantastic or delusional and rise to the level of 'irrational or wholly incredible).'" *Gibbs v. Cross*, 160 F.3d 962, 967 (3d Cir.1998) (quoting *Denton v. Hernandez*, 504 U.S. 25, 33 (1992)).

*Rittner v. Kinder*, 290 F. App'x 796, 797-98 (6th Cir. 2008); *see also Pointer v. Wilkinson*, 502 F.3d 369, 371 n.1 (6th Cir. 2007) (holding that assertions of past danger do not satisfy the imminent-danger exception). "The imminent danger exception is essentially a pleading requirement subject to the ordinary principles of notice pleading." *Vandiver v. Vasbinder*, 416 F. App'x 560, 562 (6th Cir. 2011). Moreover, because he is proceeding *pro se*, Plaintiff "is entitled to have his complaint liberally construed." *Id.* (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

As is the case in many of his actions, Plaintiff's complaint states a litany of claims against numerous Defendants at all levels of the MDOC (over 50 in this action, many of whom are not mentioned in the allegations of the complaint)[1] based on sweeping allegations of conspiracy and retaliatory conduct. The claims themselves are difficult to parse because Plaintiff frequently attributes single acts to groups of Defendants without describing any individual's role in the alleged

---

[1]Supervisors at ICF: Assistant Resident Unit Supervisor (ARUS) M. Barber, ARUS J. Gehoski, Resident Unit Manager (RUM) J. Payne, Deputy E. Huss, Deputy N. Norwood, Warden J. Prelesnik, Grievance Coordinator M. Breedlove, Inspector B. Goodson, Admin Assistant A. Vroman, and RUM H. Gilkey; Unit 1 staff at ICF: Officers (unknown) Drabek, C. King, (unknown) Rutgers, (unknown) Hall, (unknown) Hair, (unknown) Martin, (unknown) Teft, (unknown) Fergueson, and (unknown) Fair; Directors and Administrators of MDOC: Director Dan Heyns, Director Kathleen Mutschler, Director Richard McKeon, Director Dennis Straub, Richard Russell, Matthew R. Young, Jodi Washington, and Sean Lockart; the Mental Health Team at Marquette Branch Prison (MBP): A. Mosley, F. Pascoe, A. Ropar, M. Salmli, K. Kanga, K. Patel, P. Eyke, (unknown) Mickalonis, (unknown) Smith, (unknown female social worker J. Doe), T. Oshier, D. Bushong, and T. Wolak; and Supervisors at MBP: Warden R. Napel, S. Place, J. Alexander, K. Tribley, N. Dahl, T. Dahl, P. Johns, F. Govern, A. Misale, D. Etelamaki, B. Mercier, Lt. A. Makela, and Inspector L. Marsh. (Compl., Page ID#2.)

conduct, uses the passive voice and fails to identify any responsible actor, or describes conduct by individuals who are not named as Defendants.  Thus, the bulk of Plaintiff's complaint fails to satisfy even basic notice-pleading standards.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim); *see also Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004) (dismissing complaint where plaintiff failed to allege how any named defendant was involved in the violation of his rights); *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant).  Even to the extent that Plaintiff's allegations, liberally construed, provide adequate notice, they are further hampered by duplicative claims from other actions, conflicting accounts of the same circumstances, conclusory statements, and palpably absurd statements of fact.

According to the complaint, between June 2011 and February 2012, seventeen individuals[2] conspired to retaliate against Plaintiff by writing in his prison records that he was delusional for filing lawsuits.  (Compl., docket #1, Page ID#27.)  During that same time period, at least thirteen Defendants conspired to kill Plaintiff, and another seven (including the current and former directors of the MDOC) conspired with Michigan Governor Rick Snyder to transfer Plaintiff to "hostile life threatening conditions" at ICF.  (*Id.* at Page ID##27, 29, 31.)

_____

[2]Defendants Mosley, Pascoe, Ropar, Salmli, Kangas, Eyke, Patel, Mickalonis, "Jane Doe", Bushong, and Wolak, as well as the following individuals who are not Defendants:  Ann M. Lanala, Whitney Applebaum, (unknown) Apol, (unknown) Jozilin, Charles Gawge, and Houle Kirkdozeman.

- 5 -

On February 17, 2012, Plaintiff was transferred to Unit 1 of ICF, to the cell where he is now being held.  At least fourteen prison officials[3] instigated the transfer in retaliation for a lawsuit that Plaintiff filed in 2010 against officials at ICF and Marquette Branch Prison (MBP).[4] Before the transfer, Plaintiff "was told" that if he did not move to the new cell, he would be sprayed with chemical agent or "he would die from electrocution" by tasers.  (*Id.* at Page ID##5-6.)  Prison officers who are not Defendants in this action[5] used handcuffs when moving Plaintiff to the new cell. The handcuffs caused deep lacerations on Plaintiff's body and the lacerations are now infected.

The new cell is covered in urine and feces, lacks windows or circulation, and is located in unit that is overheated,[6] either because the unit has a heat problem or because prison staff intentionally keep the unit hot to "torture" Plaintiff and other prisoners.  (*Id.* at Page ID##3, 6.) Plaintiff contends that the conditions of his cell pose an imminent risk of serious injury because he has a "heat related illness," and he has experienced nose-bleeds and over ten heat-related seizures since his transfer.  (*Id.* at Page ID##3, 9.)  Also, Plaintiff "was told" by unidentified individuals that he could die from his heat-related illness, and that "Unit 1 staff Rutgers [and] Drabek et al" would kill Plaintiff if the heat did not.  (*Id.* at Page ID##6-7.)  Plaintiff "spoke with" Defendants Huss,

---

[3]Defendants Gehoski, Payne, Norwood, Huss, and Prelesnik "et al.," as well as the following individuals who are not named as Defendants:  Lieutenant Edwards, Sgt. Labelle, RUO Whufert, RUO Richardson, RUO Booth, RUO Elliott, RUO Woods, RUO Jon Nehf, and (unknown) Michelin.  (Compl., Page ID#5.)

[4]*See Gresham v. Caruso et al.*, No. 2:10-cv-200, slip op. at 14 (W.D. Mich. Nov. 17, 2011) (dismissing all but one of Plaintiff's claims for failure to state a claim, but allowing Plaintiff to proceed with his claim that Officer Jon Nehf helped prison staff use a metal object to rape Plaintiff).

[5]RUO Booth, RUO Elliott, Sgt. Labelle, RUO Richardson, and RUO Whufert.

[6]Plaintiff alternately alleges that the Unit temperature is "at least 80-90" degrees, "90-100" degrees, or "over 95-100" degrees.  (*See* Compl., Page ID##3, 13; Attach. to Compl., 02/17/2012 Prisoner Kite to LeBarre & Gawge.)

Payne, Gehoski, and Barber during their rounds and they told Plaintiff that they did not care if he died.  (*Id.* at Page ID#15.)

Plaintiff also wrote medical kites (to individuals who are not named as Defendants) in which he complained about his heat-related illness, "golf ball size" hernias in his abdomen, "large lumps that [are] likely cancer," blood in his urine, and pain in his prostate and testicles, but his requests for care were denied.  (*Id.* at Page ID#23.)  Plaintiff also alleges that he has bipolar disorder, he suffers from depression, and he is suicidal.[7]

On February 19, Officer Rutgers issued Plaintiff a retaliatory food-loaf restriction, falsely claiming that Plaintiff's cell contained rotting food.  On February 21, Officer Drabek issued Plaintiff a retaliatory misconduct ticket, falsely claiming that he found several bags of pills wrapped up inside Plaintiff's clothing.

Between February 21 and 24, unidentified Defendants told Plaintiff that he deserved to die "because he was filing too many civil lawsuits [and] [b]ecause he was a[n] advocate for prison reform[.]" (*Id.* at Page ID#24.)  These same Defendants told Plaintiff that the MDOC would not pay for cancer surgery or accommodate his heat-related illness, and his "hernias would have to explode" in order for them to be treated.  (*Id.*)

On February 24, Defendants Drabek, Hair, Teft, Rutgers, and Martin entered Plaintiff's cell, placed him in restraints, slammed his head into a wall and told him that he should not have snitched.  In addition, they: (1) told Plaintiff that his "legal property would be stolen [sic] illegally confiscated so he would not have any evidence to support his pending claims in federal

---

[7]In another recently-filed action, Plaintiff asserts that he is being treated with "anti-psychotic" medication, including "Haldo[l] . . . wellbutrin, Depico [sic], risperdol, trazerdol, and medications unknown[.]" *Gresham v. Snyder et al.*, No. 1:12-cv-143, Compl., docket #1, Page ID#45 (W.D. Mich. Feb. 10, 2012).

court and [sic] a way to dispose of his civil court evidence when he was killed"; (2) told Plaintiff

that Defendants King, Fergueson, Huss, Norwood, Hall, Barber, and Prelesnik conspired to kill

Plaintiff and confiscate his legal property; and (3) acted in conspiracy with Defendants King,

Fergueson, Huss, Norwood, Hall, Barber, and Prelesnik to present Plaintiff with the medical band

of prisoner Lester Gunn, "threatening to kill [Plaintiff]," "threatening to have [Plaintiff] hospital-

ized," and/or telling Plaintiff that he "would be killed and sent to the hospital like Lester Gunn."

(*Id.* at Page ID##19-22.)

       The foregoing allegations do not satisfy the imminent-danger exception.  With

respect to Plaintiff's health conditions, including his infected lacerations, hernias, psoriasis,

testicular lumps, prostate pain, nose-bleeds, and blood in his urine, there is no indication that these

conditions present an imminent risk of serious physical injury.  Moreover, Plaintiff does not allege

that any of the named Defendants were aware of these conditions.  The imminent-danger exception

to the three-strikes rule would serve little purpose if a plaintiff could proceed with an action against

individuals who are not liable or responsible for the danger facing him.

       With respect to Plaintiff's heat-related illness, the complaint is devoid of any details

regarding the nature of this illness, and apart from Plaintiff's seizures, there is no indication that it

poses any risk of harm.  With respect to the seizures, Plaintiff asserts that they are potentially deadly,

but the record in this and other cases undermines his claim that the named Defendants have

subjected him to a risk of serious physical injury.  Plaintiff apparently contends that his overheated

cell is the cause of his seizures, but in another recently-filed action he alleges that he was having

seizures before his transfer to that cell, *see Gresham v. Snyder et al.*, No. 1:12-cv-143, Compl.,

docket #1, Page ID#8 (W.D. Mich. Feb. 10, 2012), and that he has been receiving anti-convulsant

medication since that time, *see id.* at docket #13 (May 25, 2012) (alleging that Plaintiff has been forced to take "Depakote" and "Lamict[a]l" since February 10, 2012). Moreover, even assuming that Plaintiff's cell conditions are responsible for his "heat-related" seizures, it is not at all clear that Plaintiff complained about such seizures to prison officials, or that any Defendant was aware of them.[8]

Further undermining Plaintiff's claim of imminent danger with respect to his health is evidence that he refuses to take his prescribed medication and deliberately endangers his health in order to manipulate prison officials. In another action, Plaintiff alleged that he threatened staff that he would "resort to suicide attempts as he had in the past" to expose their misconduct. *Gresham v. Snyder et al.*, No. 2:12-cv-22, Compl., docket #1, Page ID#20 (W.D. Mich. Jan. 19, 2012). Similarly, in a kite attached to the instant complaint, Plaintiff complains about being transferred to Unit 1 and asserts, "I will not be taking my medication and refusing it and I will not talk to any outpatient staff if nothing is done about this situation." (Attach. to Compl., 02/17/2012 Prisoner Kite.) In another kite to Officers LeBarre and Gawge, Plaintiff complains that his cell is "extremely hot," that he has "heat related illnesses[,] and cannot nor will not take my medication." (Attach. to Compl., 02/17/2012 Prisoner Kite to LeBarre & Gawge.) Plaintiff then indicates what will happen if the officers do not transfer him to another cell:

> I am giving you LeBarre and Gawge a few days to immediately remove me from this cell . . . and return me to 2 unit or a cell with working facilities. If you fail to do this I have an umbilical hernia that all is needed is for me to pull it out once[.] It will cost to have me transferred to the (hospital)[.] From there I will make the additional complaints [] that you are not treating me for cancer and allowing custody staff to

---

[8]Plaintiff contends that he "spoke with" certain officers about his cell conditions, and that some officers told him that they did not care if he died, but there is no indication that Plaintiff spoke with anyone about his seizures. Moreover, the medical kites and grievances attached to Plaintiff's complaint refer to his heat-related illness but make no mention of seizures.

retaliate against me[.] Win or lose there will be cost to the state and your reputation
is on the line publicly . . . .

(*Id*.)  That Plaintiff did, in fact, stop taking his prescribed medication is consistent with Officer

Drabek's allegedly false assertion that he found several bags of pills wrapped up inside Plaintiff's

clothing.  Moreover, Plaintiff's apparent refusal to take anti-convulsant and/or anti-psychotic

medication suggests an obvious alternative explanation for his seizures and his mental state.  In

short, Plaintiff's contention that the named Defendants have subjected him to a risk of serious

physical injury by aggravating or ignoring his underlying health issues is unsupported by the

allegations of the complaint and is inconsistent with the record in this and other cases.

Finally, Plaintiff's numerous allegations that various Defendants intend to kill him

are too vague, conclusory, and/or incredible to satisfy the imminent-danger exception.  For instance,

Plaintiff's assertion that he "was told" by unidentified individuals on an unspecified occasion that

Defendants Rutgers and Drabek would kill him is too vague to suggest an imminent risk of harm.

In addition, the allegation that certain groups of state officials are conspiring to kill Plaintiff is

unsupported by the facts alleged.  Furthermore, Plaintiff's contention that certain Defendants

threatened to have Plaintiff "killed and sent to the hospital" is patently absurd.  (*See* Compl., Page

ID#22.)  Indeed, the incredible nature of Plaintiff's allegations is consistent with Plaintiff's

acknowledged mental health conditions and the similarly incredible allegations that he has asserted

in numerous other cases filed with this Court, particularly his oft-repeated claim that prison officials

at various facilities are conspiring to kill him.  *See, e.g., Gresham v. Granholm et al.*, No. 2:09-cv-

231 (W.D. Mich. Oct. 7, 2009) (prison staff raped and conspired to kill Plaintiff, who swallowed six

inches of metal); *Gresham et al. v. Neubecker et al.* No. 2:11-cv-171, docket #3 (W.D. Mich. May

9, 2011) (plaintiff was bitten by spiders in his cell, causing swelling on his face and limbs, and a

prison officer put a razor blade in Plaintiff's food); *Gresham v. LaChance et al.*, No. 2:11-cv-231 (W.D. Mich. June 13, 2011) (prison officials attempted to have Plaintiff commit suicide by placing metal objects, a razor blade, and over 400 different types of medication in his cell; also, a nurse threatened to give cyanide pills to guards so that Plaintiff could kill himself); *Gresham v. Johns et al.*, No. 2:11-cv-241 (W.D. Mich. June 23, 2011) (Plaintiff ingested a razor blade and over 400 pills because he feared that staff would poison him); *Gresham v. Nepal et al.*, No. 2:11-cv-520 (W.D. Mich. Dec. 28, 2011) (defendants deliberately left a metal object in Plaintiff's body for over two weeks with the intent to kill him); *Gresham v. Snyder et al.*, No. 2:12-cv-5 (W.D. Mich. Jan. 6, 2012) (mental health staff conspired to claim that Plaintiff is delusional; Plaintiff is under threat of being forced to take psychotropic medications that would likely kill him by paralyzing his lungs); *Gresham et al. v. Mutschler et al.*, No. 2:12-cv-12 (W.D. Mich. Jan. 9, 2012) (prison staff conspired to kill Plaintiff; a female officer had sexual relations with Plaintiff on multiple occasions to bribe him not to pursue his claim that he was raped by other officers); *Gresham v. Dahl et al.*, No. 2:12-cv-21 (W.D. Mich. Jan. 17, 2012) (prison staff conspired to medicate Plaintiff in order to sedate him and leave him vulnerable to sexual assaults; also, prison officers put razor blades and poisonous substances in Plaintiff's food); *Gresham v. Snyder et al.*, No. 2:12-cv-22 (W.D. Mich. Jan. 19, 2012) (a prison officer grabbed Plaintiff's penis and wrote two misconduct tickets on Plaintiff because he refused to engage in sexual activity with the officer); *Gresham v. Violetta et al.*, No. 2:12-cv-24 (W.D. Mich. Jan. 19, 2012) (officers placed pieces of a razor blade in Plaintiff's food and Plaintiff ingested a piece of the blade); *Gresham v. Snyder et al.*, No. 1:12-cv-143 (W.D. Mich. Feb. 10, 2012) (officials are conspiring to make Plaintiff look mentally ill so that he cannot pursue his rape claim, and are forcibly treating him with anti-psychotic medication).

For all of the foregoing reasons, therefore, the Court finds Plaintiff's allegations that he is in imminent danger of serious bodily injury to be "conclusory," "ridiculous," *Ciarpaglini*, 352 F.3d at 331, and/or "wholly incredible," *Gibbs*, 160 F.3d at 967.  Therefore, the complaint fails to satisfy the imminent-danger exception to the three-strikes rule, and § 1915(g) prohibits Plaintiff from proceeding *in forma pauperis* in this action.

Plaintiff has twenty-eight (28) days from the date of entry of this order to pay the entire civil action filing fee, which is $350.00.  When Plaintiff pays his filing fee, the Court will screen his complaint as required by 28 U.S.C. § 1915A and 42 U.S.C. § 1997e(c).  If Plaintiff fails to pay the filing fee within the 28-day period, his case will be dismissed without prejudice, but he will continue to be responsible for payment of the $350.00 filing fee.

Dated:   July 2, 2012                          /s/ Paul L. Maloney
                                               Paul L. Maloney
                                               Chief United States District Judge


**SEND REMITTANCES TO THE FOLLOWING ADDRESS**:
Clerk, U.S. District Court
399 Federal Building
110 Michigan Street, NW
Grand Rapids, MI 49503

**All checks or other forms of payment shall be payable to "Clerk, U.S. District Court."**

- 12 -